Case: 1:23-cr-00234 Document #: 1 Filed: 04/19/23 Page 1 of 18 PageID #:1

AO 91 (Rev. 11/11) Criminal Complaint      AUSA Patrick Mott (312) 554-9133
    AUSA Jimmy Arce (312) 613-2700

**FILED**
4/19/2023
THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>ANTONIO WASHINGTON,<br>    also known as "Itch" and "Britney" | CASE NUMBER: 23 CR 234<br>**UNDER SEAL** |

### CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief. On or about January 22, 2020, at Chicago, in the Northern District of Illinois, Eastern Division, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| Title 21, United States Code, Section 841(a)(1) | distribution a controlled substance, namely a mixture and substance containing cocaine base |

This criminal complaint is based upon these facts:

   X    Continued on the attached sheet.

SHAMAR BAILEY
Special Agent, Federal Bureau of Investigation (FBI)

Pursuant to Fed. R. Crim. P. 4.1, this Complaint is presented by reliable electronic means. The above-named agent provided a sworn statement attesting to the truth of the Complaint and Affidavit by telephone.

Date: April 19, 2023

_Judge's signature_

City and state: Chicago, Illinois      YOUNG B. KIM, U.S. Magistrate Judge
*Printed name and title*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

## AFFIDAVIT

I, SHAMAR BAILEY, being duly sworn, state as follows:

1. I am a Special Agent with the Federal Bureau of Investigation (FBI), and have been so employed since approximately March 2016. I am currently assigned to the FBI's Chicago Field Division, Violent Gangs - South. My official duties include the investigation of drug trafficking organizations and violations of federal narcotics laws.

2. As part of my duties as an FBI Special Agent, I investigate criminal violations relating to narcotics trafficking offenses, including criminal violations of the Federal Controlled Substance laws, including, but not limited to Title 18, United States Code, Sections 1956, and 1957, and Title 21, United States Code, Sections 841, 843, 846, 848, 952, and 963. I have been involved with various electronic surveillance methods, the debriefing of defendants, informants, and witnesses, as well as others who have knowledge of the distribution, transportation, storage and importation of controlled substances.

3. I have received specialized training in the means and methods by which individuals and drug trafficking organizations conduct their illegal drug trafficking activities. I have also participated in multiple investigations involving illegal drug trafficking by drug trafficking organizations. As such, I am familiar with the various methods used by drug traffickers to transport, store, and distribute narcotics and

narcotics proceeds. I have participated in investigations involving various drug types, including heroin, cocaine, and cocaine base in the form of crack cocaine. I have experience with a wide range of investigative techniques, including various types of visual and electronic surveillance; the interception of wire communications; the debriefing of defendants, witnesses, and informants, as well as others who have knowledge of the distribution and transportation of controlled substances; facilitating controlled deliveries of narcotics; the execution of search and arrest warrants; and the management and use of informants. Based upon my experience and training, I am familiar with the ways in which drug traffickers conduct their unlawful drug trafficking activity, including, but not limited to, their use of code words and numbers to conduct their transactions, their methods for concealing narcotics and narcotics proceeds, and their use of violence and threats of violence to protect their organization.

4.      This affidavit is submitted in support of a criminal complaint alleging that Antonio Washington, also known as "Itch" and "Britney," has violated Title 21, United States Code, Section 841(a)(1).  Because this affidavit is being submitted for the limited purpose of establishing probable cause in support of a criminal complaint charging WASHINGTON with possession with intent to distribute a controlled substance, namely a mixture and substance containing cocaine base, I have not included each and every fact known to me concerning this investigation.  I have set forth only the facts that I believe are necessary to establish probable cause to believe that the defendant committed the offense alleged in the complaint.

5. This affidavit is based on my personal knowledge, my review of audio/video recordings and other evidence, as well as information provided to me by other law enforcement agents and witnesses, and my training and experience and the training and experience of other law enforcement agents with whom I have consulted.

I. FACTS SUPPORTING PROBABLE CAUSE

    A. Introduction and Summary

6. Since early 2017, the FBI has been investigating that members of the Racketeers street gang, also known as "Rack City," a faction of the Black P Stone Nation gang, are engaged in firearms and narcotics offenses.

7. In summary, and as set forth in more detail below, on or about January 22, 2020, ANTONIO WASHINGTON, an associate of both the "Rack City" and "FinTown" factions of the Black P Stone Nation gang, provided a mixture and

substance containing approximately 53.8 grams of cocaine base to a confidential source ("CS-1")[1], in exchange for $2,500.[2]

---

[1] CS-1 has been a confidential informant for the FBI since in or around April 2009. CS-1 agreed to assist the FBI in this case, and on a previous unrelated investigation, in exchange for payments. To date, CS-1 has received cash payments from FBI totaling approximately $71,587.52. According to law enforcement databases, CS-1 has two felony convictions, including a conviction for burglary and a narcotics offense. CS-1 also has previous arrests, including for battery and theft, and, according to notices CS-1 has received from the Internal Revenue Service, CS-1 owes approximately $33,000 to the IRS for unpaid taxes and associated penalties and interest.

When CS-1 began providing information to the FBI relating to members of Rack City in approximately 2016, CS-1 informed the FBI he had personally used heroin prior to becoming a confidential informant for the FBI. While CS-1 was working as a confidential informant for the FBI, the FBI was aware that CS-1 was using a methadone patch. While acting as a confidential informant, CS-1 was regularly admonished that he must refrain from unauthorized illegal activities, including the consumption of controlled substances. On or about June 27, 2022, CS-1 admitted to law enforcement that he had been personally using heroin during the 2017-2022 time period. CS-1 further admitted that he had obtained "dime bag" quantities of heroin from Steven Nash for personal use following two controlled purchases of larger quantities of heroin for the FBI in or around 2018, on separate dates following those controlled purchases. CS-1 further admitted having purchased heroin and cocaine for personal use from ANTONIO WASHINGTON prior to cooperating with the FBI, but denied having purchased any controlled substances from WASHINGTON for personal use since becoming a confidential informant. On or about June 28, 2022, CS-1 admitted that he has been using heroin on approximately a daily basis since at least approximately 2017. CS-1 further admitted, in contradiction to his statement on or about June 27, 2022, that at some point in the period after a separate controlled purchase of crack cocaine from WASHINGTON on or about February 10, 2021, CS-1 had obtained user amounts of heroin from WASHINGTON. CS-1 further admitted that he had also received cocaine for personal use from Josephus Turner after one of CS-1's controlled purchases of cocaine from Turner, potentially during the 2018-2020 time period. As a result of CS-1's admissions and unauthorized conduct, FBI has closed CS-1 as a confidential informant.

This affidavit contains a limited number of statements made by CS-1 relating to CS-1's controlled purchases from WASHINGTON. I have only included in this affidavit statements of CS-1 that have been corroborated by my review of the video and audio recordings of the controlled purchases, law enforcement surveillance of the controlled purchases, and the contraband CS-1 provided to law enforcement upon completion of the controlled purchases.

[2] According to Chicago Police Department ("CPD") records, WASHINGTON regularly uses the alias "Britney Washington" but his true name is ANTONIO WASHINGTON. According to Illinois Secretary of State records, the name listed on WASHINGTON's Illinois driver's

**B. WASHINGTON Sold a Mixture and Substance Containing Approximately 53.8 Grams of Cocaine Base on or about January 22, 2020.**

8. At the direction of law enforcement, on or about January 20, 2020, at approximately 4:09 p.m.[3], CS-1 placed an outgoing consensually recorded call to WASHINGTON, who was using 773-XXX-1758.[4] During the call they discussed the following:

> WASHINGTON: Hello.
> CS-1: Hey, Whattup Itch [WASHINGTON]?
> WASHINGTON: What's up?
> CS-1: You hear me?
> WASHINGTON: Huh?
> CS-1: I say you hear me?

---

license is "Britney Washington." Both the CPD records and the Illinois Secretary of State records list the same birthdate, home address, and approximate height and weight for WASHINGTON. Both CPD records and Illinois Secretary of State records contain photographs of WASHINGTON taken on different dates. The appearance of WASHINGTON in the photographs is substantially the same and, as discussed below, matches the appearance of WASHINGTON on the video recordings of WASHINGTON's meeting with CS-1 on or about January 22, 2020.

[3] Unless noted otherwise, the times, dates and phone numbers dialed for outgoing recorded calls placed by WASHINGTON are based on the information captured by the FBI's automated call recording systems.

[4] Law enforcement subsequently identified WASHINGTON as the user of the telephone number 773-XXX-1758 based on the following: After the consensually recorded call, on or about January 22, 2020, CS-1 conducted a video-recorded purchase of a mixture and substance containing cocaine base from WASHINGTON. Law enforcement has reviewed the video of the purchase from WASHINGTON and confirmed that WASHINGTON is the person who conducted the transaction with CS-1 by comparison to WASHINGTON's booking photo. Law enforcement conducted a voice comparison of the user of the telephone number 773-XXX-1758 with the voice of WASHINGTON, as recorded on the consensual recording of the January 22, 2020 transaction described below and determined that they are the same person. Additionally, according to the video of the January 22, 2020 transaction, WASHINGTON departed the meeting with CS-1 in a black Chevrolet Sierra truck with Illinois license plate 2735022 B, registered to "Britney Washington" (a known alias for WASHINGTON) at an address on the 8900 block of S. Normal Avenue in Chicago, the listed residence for WASHINGTON on WASHINGTON's Illinois driver's license.

WASHINGTON: Yeah what's up?

CS-1: Hey, I just heard from my man, man. On that 6 trey [63 grams of crack cocaine], he'll be in town Wednesday afternoon or so. He wanna do it, but he say he ain't got but 23 [$2,300] man.

WASHINGTON: Aw nah, I can't do nothin' with that.

CS-1: You can't let 23 [$2,300] for two this time?

WASHINGTON: I ain't makin' shit [a financial profit]. Shit that's takin' out my pocket [result in a financial loss]. Nah I can't do nothin' bro.

CS-1: Can't do it.

WASHINGTON: Nah I can't do nothin' bro.

CS-1: Aight. I'll let him know.

WASHINGTON: Aight. Aight.[5]

9. Based on the contents and context of the above conversation, my training and experience, and the training and experience of other law enforcement officers with whom I have consulted, I believe that CS-1 related to WASHINGTON that his/her fictitious customer could pay no more than $2,300 for the purchase of 63 grams of cocaine. I believe that WASHINGTON stated that the price of $2,300 for 63 grams of cocaine would not be acceptable, as WASHINGTON would experience a financial loss by agreeing to that price.

---

[5] Some of the consensually recorded conversations from this investigation are summarized in this Affidavit. The language that is quoted from the recorded conversations throughout this Affidavit is based upon a preliminary review of the recorded conversations, not final transcripts. These summaries do not include all statements or topics covered during the course of the recorded conversations. At various points in the Affidavit, I have indicated (sometimes in brackets) my interpretation of words and phrases used in the recorded conversations. My interpretations are based on the contents and context of the recorded conversations, events that took place before and after the conversations, my knowledge of the investigation as a whole, my experience and training, and the experience and training of other law enforcement agents in this investigation.

10. On or about January 21, 2020, at approximately 3:37 pm, CS-1 placed an outgoing recorded call to WASHINGTON, who was using 773-XXX-1758. During the call they discussed the following:

WASHINGTON: Hello.

CS-1: Itch [WASHINGTON].

WASHINGTON: Hey man. What's up man? Why you keep sayin' my name and shit? What's up?

CS-1: Well shit, I didn't, it didn't sound like you at first.

WASHINGTON: Anyway, you ain't gotta say my name. What's up though? What's goin' on?

CS-1: Aight. My man got the other 200 [$200] together. He'll be back in tomorrow man. Can uh, we do this about noon?

WASHINGTON: Yeah.

CS-1: Aight uh, I'll probably just have him park at the McDonald's and I'll walk out, or meet you over there?

WASHNGTON: Where?

*****

WASHINGTON: You gonna meet me where?

CS-1: I assumed maybe on Wabash.

WASHINGTON: Ah hell nah. Nah. Ain't nothin' goin' on over there. We gotta meet somewhere else.

CS-1: Aight well then fuck it, we'll meet over there on Home Depot or something. Or Starbucks.

WASHINGTON: Yeah I'll figure it out when you ready. When you ready, then we gonna figure that out. You know what I'm sayin'?

CS-1: Yeah.

WASHINGTON: Alright. When you ready. When you ready tomorrow morning we gonna figure everything else out.

CS-1: Aight man. Hit you tomorrow when he get back in.

WASHINGTON: Aight. Ok.

CS-1: This one of my trucking buddies.

WASHINGTON: It's all good. But Imma let you know we gonna go through everything when you ready.

7

11. On or about January 22, 2020, at approximately 9:25 a.m., CS-1 placed an outgoing consensually recorded call to WASHINGTON, who was using 773-XXX-1758. During the call they discussed the following:

> WASHINGTON: Hello.
>
> CS-1: Hey. Ok. Everything cool right?
>
> WASHINGTON: Yeah what's up?
>
> CS-1: Aw he [CS-1's customer] gonna bring me the cash. Imma be out at "Smoke" [James Bruce] now in a little bit, to get a cut before I make a run with dude in the truck.
>
> WASHINGTON: You say you gonna do what?
>
> CS-1: I say Imma be out – headed out to Smoke's [Bruce's residence] to get a little cut before I leave. Imma head out with dude in the truck once we do this. He want me to take a run with him to help him drive so I plan on being out at Smoke's around about 11, 11:30 or so.[6]
>
> WASHINGTON: "Smoke" crib?
>
> CS-1: Yeah.
>
> WASHINGTON: You gonna have the money with you then.
>
> CS-1: Yeah. Hell yeah. Shit.
>
> WASHINGTON: Aw yeah. Yeah. Yeah that's cool.
>
> CS-1: Ok. Aight so yeah. I'll hit you up uh, when I'm gettin' there and uh, shit let's do this. Aight?
>
> WASHINGTON: Yeah. Aight.

12. Based on the contents and context of the above conversation, my review of the audio-video recordings captured by CS-1 on or about January 22, 2020, my training and experience, and the training and experience of other law enforcement officers with whom I have consulted, I believe CS-1 and WASHINGTON agreed to

---

[6] As discussed further below, at the direction of law enforcement, CS-1 had also separately arranged to purchase a .357 revolver from James Bruce, a/k/a "Smoke." Based on recorded calls between CS-1 and Bruce, the purchase from Bruce was scheduled to go forward at Bruce's residence on the 8900 block of S. Union Avenue on January 22, 2020.

meet at the residence of James Bruce, a/k/a "Smoke" to purchase crack cocaine from WASHINGTON.

13. On about January 22, 2020, at approximately 9:37 a.m., CS-1 placed an outgoing consensually recorded call to WASHINGTON, who was using 773-XXX-1758. During the call they discussed the following:

> WASHINGTON: Yeah.
>
> CS-1: Hey, I meant to tell you, I ain't tell him [Bruce] nothin' about what we was doin' so...
>
> WASHINGTON: Right [UI].
>
> CS-1: Right ok. I was just makin' sure. Aight then. Hit you up when I'm on my way.
>
> WASHINGTON: Say what time?
>
> \*\*\*
>
> CS-1: I plan on being there at Itch's [Bruce's residence][7] about 11:30 [a.m.], quarter to twelve. Shit – 'cause I got to go up there to meet with him before I leave to go take this load.
>
> \*\*\*
>
> WASHINGTON: Hit me when you headed that way.

14. On or about January 22, 2020, at approximately 11:44 a.m., CS-1 arrived at a predetermined meeting location with a purple rolling bag, where CS-1 and the purple rolling bag were searched by law enforcement, who found no illegal contraband or excess U.S. currency. CS-1 was then provided with $2,500 for the

---

[7] Based on my review of the consensually recorded calls that CS-1 made to WASHINGTON and Bruce, as well as my review of the audio-video recording captured by CS-1 on or about January 22, 2020, I believe that CS-1 had intended to say that he/she was headed to Bruce's residence, not "Itch's" (WASHINGTON's) residence. WASHINGTON did not correct CS-1 and appears to have understood what CS-1 had intended to say based on CS-1's prior call in which CS-1 had said CS-1 was headed to "Smoke crib."

9

purchase of 63 grams of crack cocaine from WASHINGTON.[8] At approximately 12:00 p.m., CS-1 departed the meet location and, while under constant surveillance, traveled to the area of Bruce's residence near 87th and South Union in Chicago, where he/she arrived at approximately 12:07 p.m.

15. While walking to Bruce's residence, at approximately 12:02 pm, CS-1 placed an outgoing consensually recorded call to WASHINGTON, who was using 773-XXX-1758. During the call, which was also recorded on CS-1's audio and video recording devices, CS-1 informed WASHINGTON that he was "walkin' up to Smoke's now" and that "Smoke" was trying to leave within the next "few minutes." WASHINGTON responded that he would start making his way to the area.

16. Based on my review of the audio-video recording captured by CS-1, after CS-1 arrived at Bruce's residence on S. Union Avenue, Bruce and CS-1 walked north through the alley to the backyard behind a different residence on the west side of the alley, which Bruce referred to as "Reed's house." According to CS-1 and the audio-video recording, CS-1 provided Bruce with $300 and received from Bruce a Sturm Ruger & Co. Inc., caliber .357 revolver, bearing serial number 571-87183, along with three hollow-point rounds.[9] After conducting the purchase of the .357 revolver from

---

[8] Additionally, CS-1 was provided with $300 in FBI funds for a separate controlled purchase, specifically the purchase of a firearm from James Bruce (a/k/a "Smoke"). As discussed below, both transactions were video recorded by CS-1 during one continuous recording. CS-1 was searched by law enforcement at the conclusion of both transactions and found to have no excess cash or other contraband.

[9] Additional details relating to the controlled purchase of the firearm from Bruce are contained in a separate affidavit being submitted today in support of a complaint charging Bruce with one count of unlawful possession of a firearm by a convicted felon.

10

Bruce, CS-1 placed a call to WASHINGTON that was partially recorded on CS-1's body-worn recording device.[10] During the call, CS-1 asked WASHINGTON (referred to as "Itch") how far away WASHINGTON was from their agreed meeting location. As captured by the recording, CS-1 explained that he/she was "in back of Reed's house" with "Smoke ass," referring to Bruce, and that "this muthafucka rushin' me off."

17. According to the audio-video recording, CS-1 and Bruce then returned to Bruce's backyard. As partially captured by CS-1's audio-video recording, CS-1 then received an incoming call. Based on the voice of the person who placed the call (as captured on the audio-video recording) as well as the content and context of the conversation, I believe the caller was WASHINGTON. During the call, CS-1 stated CS-1 was still in "Smoke's" backyard with CS-1's bag stuck in "Smoke's" garage while "Smoke" went to buy cigarettes. According to the audio-video recording, CS-1 told WASHINGTON that CS-1 was running low on time. WASHINGTON responded that he would "walk up."

18. As captured in the audio-video recording, CS-1 subsequently received another incoming call, which was partially audible on CS-1's video recording device. Based on the voice of the person who placed the call (as captured on the audio-video

---

[10] For the calls described in paragraphs 17 and 18 of this affidavit, CS-1 did not place the call using FBI's automatic recording system. In addition, the service provider for CS-1's telephone number was unable to provide call detail records for this time period. As a result, I do not have records confirming the phone numbers that CS-1 dialed to make the call or the precise times of the calls. My belief that CS-1 spoke to WASHINGTON during these calls is based in part on the content and context of the conversations and in part on the portions of the audio-video recordings during which WASHINGTON's voice was audible.

11

recording) as well as the content and context of the conversation, I believe the caller was WASHINGTON. During the call, WASHINGTON informed CS-1 that he was at the residence of "Reed," referring to the location where Bruce had provided CS-1 with the firearm earlier that day. According to the audio-video recording, CS-1 proceeded to walk through the alley with the purple rolling bag containing to the rear of "Reed's" residence, on the west side of the alley running between the 8900 block of S. Union Avenue. and the 8900 block of S. Emerald Avenue. According to audio-video recording, CS-1 then waited in the gangway on the south side of the residence for WASHINGTON to arrive.

19. According to the audio-video recording, WASHINGTON (depicted below) arrived at the front of "Reed's" residence and walked down the gangway from S. Emerald Avenue to meet CS-1, while carrying a black plastic bag in his right hand.



12

20. According to the audio-video recording, as depicted below, while holding the bag in his right hand, WASHINGTON pulled a white object out of his left pocket with his left hand and said "6-3 [63 ounces]," referring to the quantity of crack cocaine that CS-1 previously agreed to purchase from WASHINGTON.



21. According to the audio-video recording, WASHINGTON, while still holding the black plastic bag, asked CS-1 if CS-1 needed a bag. CS-1 responded, I'm gonna put it in that bag," and turned the direction of the purple rolling bag. On the audio from the recording, a bag can then be heard being unzipped, consistent with CS-1's recorded statement that he/she would place the item he/she received from WASHINGTON in the purple rolling bag. According to the audio-video recording,

13

after CS-1 provided WASHINGTON with the $2,500 provided by FBI, WASHINGTON asked, "This 25 [$2,500]?" CS-1 responded, "Yeah."

22. According to the audio-video recording, WASHINGTON walked back up the gangway toward S. Emerald Avenue and then, as depicted below, got into a black Chevrolet Sierra pickup truck bearing Illinois license plate 2735022, which is registered to WASHINGTON at the residential address listed on WASHINGTON's Illinois driver's license ("Washington Vehicle 1").



14



23. According to the audio-video recording, CS-1 followed WASHINGTON out of the gangway onto S. Emerald Avenue and then proceeded on foot toward a predetermined meet location. Law enforcement surveillance observed CS-1 walking down S. Emerald Avenue away from the purchase location at approximately 12:47 p.m. and then walk directly to the meet location under constant surveillance, arriving at approximately 12:57 p.m. The audio-video recording also shows that CS-1 walked directly from the location of the purchase from WASHINGTON to the predetermined FBI meet location without stopping at any other locations or meeting with any other individuals.

24. Law enforcement searched CS-1 and CS-1's purple rolling bag and did not find any additional contraband or excess cash on CS-1 or in the purple rolling bag. CS-1 provided law enforcement with the above-referenced Sturm Ruger & Co. Inc., caliber .357 revolver, bearing serial number 571-87183, along with three hollow-point rounds supplied by Bruce, as well as the below-depicted baggie containing a

15

white substance suspected to be crack cocaine supplied by WASHINGTON, which weighed approximately 63.6 grams when placed on a scale at FBI's office in Chicago.



25. On or about March 21, 2022, the DEA North Central Laboratory determined that the rock-like white substance contained in the plastic baggie that WASHINGTON sold to CS-1 on or about January 22, 2020 weighed approximately 53.8 grams and consisted of a mixture and substance containing cocaine base.

## II. CONCLUSION

26. Based on the foregoing facts, I respectfully submit that there is probable cause to believe that, on or about January 22, 2020, WASHINGTON knowingly

distributed a controlled substance, namely a mixture and substance containing cocaine base, in violation of 21 United States Code, Section 841(a)(1).

FURTHER AFFIANT SAYETH NOT.

_____
SHAMAR BAILEY
Special Agent, Federal Bureau of Investigation

SWORN TO AND AFFIRMED by telephone April 19, 2023.

_____
Honorable YOUNG B. KIM
United States Magistrate Judge

17